_____ FILED         _____ LODGED
_____ RECEIVED      _____ COPY

DEC 1 5 2004

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ KC9 _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Cynthia Allocco and Ralph Allocco,)   No. CV-01-2220-PHX-ROS
husband and wife,                 )
                                  )   **AMENDED ORDER**
        Plaintiffs,               )
                                  )
vs.                               )
                                  )
                                  )
Metropolitan Life Insurance Company, a)
foreign corporation,              )
                                  )
        Defendant.                )
                                  )
                                  )
_____)

**I.      Undisputed Findings of Fact.**

        1.      In early May 2000, Plaintiff Cynthia Anne Allocco had been employed by American Express as a telephone customer service representative for 3 years.  Her performance evaluations were the highest or almost the highest ratings in all categories.

        2.      Her duties as a customer service representative required her to be able to engage in the following types of activities on a repetitive and sustained basis:

                a) The ability to physically remain seated at her computer work station for 8 hours;

                b) The ability to repetitively focus and concentrate on detailed print information displayed on a computer screen; and

                c) The ability to analytically, coherently, and efficiently communicate and "problem solve" with American Express customers within specific time parameters.

3.      Apparent from records for 1987 to May 2, 2000, Ms. Allocco had a multi-year history of fibromyalgia with attendant pain, weakness and fatigue.  At the time of trial she had been diagnosed with vertigo and dizziness, and a CT scan revealed a 6 mm stone in the left parotid duct.  On April 4, 2000, 30 days before her departure from work, she went to Mayo Clinic's urgent care center.  The physician's notes reflected that she had a two-year history of overall fatigue and weakness along with pain in her neck muscles.

## II.    Undisputed Facts - Plaintiff's Trial Testimony.

At trial, Plaintiff testified that during the approximate 3-month time frame before May 5, 2000, she suffered the following symptoms:

a) "I was increasingly weak, and it was getting harder to hold myself up.  I was just straining to work and sleep." (Anne Allocco, 10/14/02, page 16, lines 16-18)

b) "The very first that I missed work with the collapse – I couldn't – I was trying to get ready for work and I wasn't able to think clearly or speak clearly at all.  It was just getting out a couple of words.  It was like a - a fixed gaze like a tunnel vision or something. . . .  It was terrifying because I didn't even know what was going wrong, and I couldn't even hold myself up at all to move that day." (Anne Allocco, 10/14/02, page 22, line 23, to page 23, line 6)

c) "I wasn't able to see, think, talk, move.  I had symptoms that were worse than the worse [sic] flu that I've ever had.  I wasn't able to lift up my hand, anything." (Anne Allocco, 10/14/02, page 23, lines 15 through 18)

d) "I had . . . a feeling beyond any kind of exhaustion you ever felt." (Anne Allocco, 10/14/02, page 24, lines 20 to 22)

e) "I had trouble even using the phone and was having trouble seeing, writing, handwriting.  I was going by feel. The vision was blurred and it would – when I moved my head, it kind of trailed and this would be worse, this trailing and this pre-vertigo sensation when I started having the attacks. . . .  I couldn't watch television without it making me sick. [I had this] nauseated feeling, like a sick headache, as if some wild pattern kept trying to make you dizzy or something. . . . I was actually vomiting when I started the spinning.  When the vertigo attacks started with the spinning, I was vomiting.  After that, it was just nausea. . . . With the vertigo, you even have to – they tell you you can't even lie down to go to sleep which, for me, meant no sleep at all." (Anne Allocco, 10/14/02, page 28, line 22 to page 29, line 25)

- 2 -

III.   **Legal Principles.**

Though diagnosis of fibromyalgia can be elusive because manifested in a variety of symptoms, there is nothing in Plaintiff's catalog of ailments inconsistent with the disease. See Sarchet v. Chater, 78 F. 3d 305, 306-07 (7th Cir. 1996) (principal symptoms include "'pain all over,' fatigue, disturbed sleep, stiffness and...multiple tender spots"). Complicating matters is that it is difficult to determine the severity of symptoms because of the unavailability of uniformly objective clinical tests. Fragale v. Chater, 916 F.Supp. 249 (W.D. N.Y. 1996). The Ninth Circuit in a Social Security case set forth some useful objective criteria to judge a claimant's *subjective* allegations of pain and concomitant severity. Fair v. Bowen, 885 F.2d 597 (9th Cir. 1989). For example, the Court suggested that an analysis of the claimant's daily activities should include consideration of the existence of an unexplained failure to take medication or to seek treatment and of the ordinary techniques of credibility evaluation such as the existence of inconsistent statements, and a claimant's reputation for truth telling. Of course in this matter the personal observations of the Plaintiff by Ms. Gail Vickery (Met Life's nurse consultant) over the phone and those of the Court when Plaintiff testified, are of utmost importance in reaching the final decision on credibility. In Fair, the Ninth Circuit concluded with refreshing candor: "It may well be that a different judge, evaluating the same evidence would have found [the Plaintiff's] allegations of disabling pain credible." Fair v. Bowen, 885 F.2d at 604. See also Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001); Fragale v. Chater, 916 F.Supp. 249, 252-55 (W.D.N.Y. 1996) (The diagnosis of fibromyalgia is based upon some objective findings but perhaps more than most diseases, it requires assessing the patient's pain; a diagnosis should reflect the importance of deference to the claimant's credibility, self assessment of pain, and personal observations).[1]

---

[1]     Personal observations include those made by evaluation of a person's response to questions over the phone, for example; by tone of voice, pauses, and inability to understand questions.

**IV.    Facts Supporting a Finding of Short Term Disability.**

    A.    Recent Information.

    1.    Since the time she first claimed disability, Ms. Allocco consistently testified without ambiguity that she felt she could not perform her job functions at American Express:

> "I knew that I could in no way remotely do any aspect of my job, whether it be just being able to hold myself up, concentrate on the customer's questions, or anyone's to be able to respond appropriately and coherently, or be able to see the screen and not be sick. Certainly during all the vertigo attacks when you're spinning and vomiting and are advised not to move and try to sleep standing up, sitting up, which means no sleep, and I could get no sleep.  I was just barely able to talk, think, move. . . ." (Anne Allocco, 10/14/02, p. 70, lines 9 through17).

Significantly, it is a well-accepted medical finding that those with fibromyalgia can experience mental impairment symptoms.  See Sarchet, 78 F.3d at 308, where the Seventh Circuit stated: "Ignored is the long list of medical ailments from which Sarchet suffers and, so far as appears, has long suffered, over and above fibromyalgia...She is depressed and takes antidepressants." (Emphasis added.)

    2.    Ms. Allocco left work May 5, 2000 and she was examined by a psychiatrist. Though Dr. Timothy Daley from the Mayo Clinic was not a practicing psychiatrist, he observed what would be obvious to any doctor, that is, she was "quite excited and anxious and presents with mannerisms, behaviors and conversations that seem manic vs. hypomanic." Further, consistent with her history, Dr. Daley diagnosed fibromyalgia symptomatology.

    3.    On May 8, 2000, three days after her departure from American Express, Dr. Olsztyn signed a certification of temporary total disability for Ms. Allocco diagnosing severe fatigue, fibromyalgia and candiadosis, and that her prognosis for returning to work was "fair," because she suffered "severe fatigue," mental functioning impairment including memory and concentration.  Again, the doctor's records reflect his first diagnosis of chronic fibromyositis occurred in 1987.[2]

---

[2]    The record does not reflect whether Dr. Olsztyn prescribed any medication.

4.   On May 16, 2000, Gail Vickery, conducted a detailed interview with the Plaintiff concerning her medical condition insofar as her job-specific requirements and functional capabilities were concerned.  Ms. Vickery received the following information:

a) Plaintiff worked five days a week from 2:45 p.m. until 11:15 p.m.

b) Plaintiff had unsuccessfully tried acupuncture in the past to get relief from her fibromyalgia;

c) Plaintiff had been very weak since being ill with a salivary duct stone in early 2000;

d) Plaintiff's fibromyalgia symptoms had worsened since early 2000;

e) Plaintiff had difficulty concentrating;

f) Plaintiff couldn't finish sentences while speaking to [American Express] Card members;

g) Plaintiff was crying at work and had her head down on her desk;

h) Plaintiff was too weak to even hold her husband's hand;

i) Plaintiff "couldn't hardly walk or hold herself up," her arms being very weak;

j) Plaintiff couldn't even carry her purse into her doctor's office;

k) Plaintiff feels like she is an invalid;

l) Plaintiff said that cognitively she was doing "totally the wrong thing several times an hour where she wasn't concentrating;"

m) Plaintiff made efforts to assist herself with a biofeedback tape as well as attempting exercises in her pool at her apartment complex;

n) Plaintiff was using a TENS unit;

o) Plaintiff was "very nauseous" with vomiting;

p) Plaintiff had been to the emergency room because she was nauseous, vomiting and the room was spinning.  She had been placed in a neck brace;

q) She was on prescription medication for dizziness;

1    r) Plaintiff had been trying to push herself "to stay at work;"

2    s) She had difficulty sleeping;

3    t) She had recently married in March 2000 but was ill on her honeymoon.

4    u) She had never missed work previously due to her fibromyalgia and stated

5    that when the symptoms appeared, she would often "struggle to go to work."

6    5.    Ms. Vickery testified that she "believed" what Plaintiff told her including that

7 Ms. Allocco "seemed sincere."

8    6.    The file is replete with Ms. Allocco's statements that she repeatedly encouraged

9 Met Life claims handlers to contact her supervisors and co-workers for corroboration or

10 dispute with her condition. But Met Life did not take advantage of this opportunity. It is of

11 significance that Ms. Vickery, a medical practitioner, was familiar with fibromyalgia, and was

12 the only Met Life employee who had personal experience with Ms. Allocco including lengthy

13 conversations about her symptomatology.[3]

14    B.    Medical History and Opinion.

15    7.    Through 1999 and 2000, Ms. Allocco's primary care physician was David

16 Bryman, who had treated Plaintiff for fibromyalgia, including recommending acupuncture.

17 Familiar with Ms. Allocco's medical history, on May 8, 2000, Dr. Bryman diagnosed her with

18 severe fibromyalgia and concluded:

19    "Being evaluated and due to severity of condition it is recommended that she
not return to work till further notice when pain is under control with therapy."

20

21    8.    Dr. Bryman also filled out an "Attending Physician Statement of Disability"

22 dated June 2, 2000 which stated that Ms. Allocco was suffering from vertigo, fibromyalgia,

23

24    [3]    As an employee of Met Life from whom she received her salary, Ms. Vickery
steadfastly, and no doubt with some courage, maintained the opinion that Ms. Allocco was

25 disabled and of significance, she supported her decision with reliable records. It is worthy
of comment that Ms. Vickery persisted in the investigation even after the appeal commenced

26 and after her work was complete. It is also of significance that because Ms. Vickery directly
interfaced with Plaintiff, she was effectively the sole person to evaluate Plaintiff's credibility

27 and in particular, whether she was malingering. If she had a bias, one would axiomatically

28 conclude that it would be in favor of her employer.

1  muscle weakness, insomnia and fatigue. He noted the one consistently observed phenomenon
2  of fibromyalgia; numerous trigger points consistent with his diagnosis of severe fibromyalgia.
3  Sarchet, 78 F.3d at 306. Of significance, uniformly, courts have held that trigger point
4  pain sites may be the only common symptom of fibromyalgia. Also, the presence of trigger
5  points satisfies the diagnostic criteria by the American College of Rheumatology. This was
6  followed by Dr. Bryman's observation of her restricted sitting, standing and concentration.
7  Importantly, Plaintiff's psychological functioning was rated "Class 5," the most "debilitating
8  and severe rating," which is defined as follows: "Patient has significant loss of psychological,
9  physical, personal and social adjustment," substantially below her normal functional capacity.
10 Though Dr. Bryman's documentation was not a work of art, he made clear that based on his
11 years of experience in treating Ms. Allocco and his recent examination and analysis of her
12 condition, she was disabled.

13  9. Again, because of the subjectivity of pain associated with fibromyalgia,
14 application of well-accepted criteria were applied. Ms. Vickery not only looked for objective
15 manifestation of pain but analyzed the "credibility" of the claimant in expressing her pain. Ms.
16 Vickery agreed that the Attending Physician Statement prepared by Dr. Bryman "very clearly
17 set out specific restrictions and limitations." Ms. Vickery testified that she and Met Life did
18 as they should have, that is, abided by the diagnostic criteria established by the American
19 College of Rheumatology and the DSM criteria for a diagnosis of fibromyalgia.

20  C.  Additional Evaluation and Findings.

21  10. On May 15, 2000, Ms. Allocco was evaluated by Swarna Chaliki, M.D. of the
22 Mayo Clinic and Kara Jobe, an occupational therapist, based upon her complaints of vertigo.
23 Dr. Chaliki believed Plaintiff had BPPV (benign paroxysmal positional vertigo) because her
24 "symptoms [were] very characteristic of this disorder."

25  11. Because her behavior was noted by the medical staff as aberrant and indicative
26 of psychiatric symptoms which emerge with the disease of fibromyalgia, on May 18, 2000,
27 Ms. Allocco was seen by Lee Ann Kelley, M.D., a psychiatrist from the Mayo Clinic.

28

1   Sarchet, 78 F.3d at 308.  Dr. Kelley noted and did not express doubt about Plaintiff's reports
2   of crying spells, anxiety, decreased activity and memory problems - all symptoms of anxiety
3   disorder.  The record did not give her any reason to question Ms. Allocco's psychiatric illness.

4          12.    Further, in an effort to assist in treating her multiple disability conditions at the
5   direction of her treating physicians, Ms. Allocco underwent physical therapy from June 13,
6   2000 through early September 2000.  The therapist found that Ms. Allocco had restrictions
7   directly related to her work responsibilities, that is, in her ability to sit, walk, and sustain any
8   overhead activity due to pain and fatigue/weakness.

9          13.    Regarding another of her composite of ailments, on July 6, 2000, Bryan Ganter,
10  M.D., a physical and rehabilitation medicine specialist from Mayo, stated in a disability
11  assessment report that he believed a significant component of Ms. Allocco's pain was as a
12  result of her rotator cuff tendonopathy as well as concomitant fibromyalgia and diffused
13  myofascial pain.  Significantly, as to her fibromyalgia, Dr. Ganter identified that she "certainly
14  has considerable tender points," the universally accepted sign of fibromyalgia.

15         14.    Dr. Kelley saw Ms. Allocco again on July 20, 2000 and, once again, Dr. Kelley
16  diagnosed Ms. Allocco as very anxious with a concrete diagnosis of anxiety disorder.

17         15.    Dr. Bryman again attempted to persuade Met Life that Ms. Allocco was
18  disabled.  He wrote a letter for Met Life's benefit dated July 26, 2000, repeating the diagnoses
19  of fibromyalgia as well as severe myalgias and arthralgias along with neck and back pain.  In
20  addition, Dr. Bryman noted her problem with BPPV, another contribution to her disability
21  from working as a telephone customer service representative.  Importantly, he confirmed what
22  then should have been obvious: Ms. Allocco was suffering from depression and anxiety, as
23  "confirmed" by the work-up at the Mayo Clinic.  Dr. Bryman concluded by stating that Ms.
24  Allocco would need continued physical therapy as well as psychological support.

25         16.    On August 28, 2000, Dr. Kelley observed Ms. Allocco again and elevated her
26  description of the severity of Ms. Allocco's symptoms, adding that she had poor concentration
27  and memory, poor energy and poor sleep patterns.  As of this visit, Dr. Kelley had added
28

1 "major depression," a very serious illness recognized in the <u>Diagnostic and Statistical Manual</u>

2 <u>of Mental Disorders</u> ("DSM-IV"):

3      (1) depressed mood most of the day, nearly every day, as indicated by either
subjective report (e.g., feels sad or empty) or observation made by others (e.g.,

4      appears tearful)....

5      (2) markedly diminished interest or pleasure in all, or almost all, activities most
of the day, nearly every day (as indicated by either subjective account or

6      observation made by others....

7      (4) insomnia or hypersomnia nearly every day...

8      (6) fatigue or loss of energy nearly every day

9      (7) feelings of worthlessness or excessive or inappropriate guilt (which may be
delusional) nearly every day (not merely self-reproach or guilt about being sick)

10

     (8) diminished ability to think or concentrate, or indecisiveness, nearly every

11      day (either by subjective account or as observed by others)...

12 DSM IV TR at 356 (4th ed. 1994).

13 Dr. Kelley was very concerned for Ms. Allocco and opined that her symptoms had been and

14 would continue to be disabling for the foreseeable future and conclusively found, adding to

15 the other medical practitioners and Ms. Vickery, that "she is not capable of working."

16      17. As the August 21, 2000 progress note indicated, Ms. Allocco attended all of her

17 therapy sessions which, at that point in time, constituted 15. Unambiguously, her consistent

18 good faith efforts to treat her problems corroborates Plaintiff's credibility that she was not

19 malingering. She demonstrated the desire and motivation to improve her physical condition

20 and return to work.

21      18. Yet another medical practitioner found Ms. Allocco disabled. As of October

22 11, 2000, Dr. Goff, her psychotherapist, found Plaintiff to have "a number of cognitive

23 deficits including moderate impairment of visual-perceptual organization and visual-motor

24 abilities, severe impairment of cognitive processing and speech, moderate impairment of

25 concentration and attention span and severe impairment of learning deficiency and immediate

26 recall."

27

28

1    19.    Ms. Allocco was also noted to be suffering from horizontal dystagmus described

2    as "a symptom of the BPPV, where the eyeball jerks diagonally."

3         D.    Ms. Allocco Was Short Term Disabled.

4    20.    It is beyond peradventure that during the applicable period of time, May 5

5    through November 7, 2000, when short-term benefits were at issue, Plaintiff was seen by

6    numerous medical practitioners in multiple specialties including family practice, internal

7    medicine, otolaryngology, preventative medicine, acute illness, physical and rehabilitation

8    medicine, psychiatry, and occupational medicine.    In addition, she underwent

9    neuropsychological testing.  Because corroborative documentation and examinations were

10   available, many of these medical practitioners stated, without qualification, that Ms. Allocco

11   was, at a minimum, temporarily disabled from performing her job duties at American Express.

12   Though some practitioners did not so conclude, the Court finds their opinions unpersuasive

13   because their contact with her was nonexistent or very limited and their conclusions are

14   inconsistent with reliable evidence.  Finally, some of their opinions require closer scrutiny

15   because they were associated with or hired by Met Life.  The bad faith of Met Life concluding

16   that Ms. Allocco was not disabled on a short term basis does not require an exquisite and

17   microscopic analysis of the facts.  It is plainly apparent from the record available to Met Life.

18   21.    Importantly, Plaintiff's medical records and the opinions of her treating

19   physicians contain more than sufficient evidence that Plaintiff's complaints were not merely

20   "subjective" but were corroborated by a variety of objective findings including:

21                a) actual observations by many treating physicians;

22                b) many identifiable areas of tenderness/trigger points;

23                c) range of motion limitations;

24                d) neuropsychological testing;

25                e) examination findings by physical therapists.

26   22.    The Court agrees with the unchallenged principle that fibromyalgia is enigmatic,

27   requiring careful analysis and re-analysis because the symptoms are dynamic and the genesis

28

1  is as yet unknown. The Court finds that within a short time after the claim was opened, Met

2  Life had no basis to question any of the opinions or diagnoses of all of Plaintiff's medical

3  providers on the grounds of provider inexperience, incompetency or bias.

4      Further information regarding the reasons Plaintiff should have been declared disabled

5  is contained in the findings below.

6      E.    Met Life's Suspicions.

7      23.    The Court recognizes that at the outset of the claim, issues surfaced which

8  raised questions whether Ms. Allocco was disabled. The Plaintiff's husband was rumored to

9  have filed for disability; Dr. Bryman's report was not a model of clarity nor was it as

10 comprehensive as it should have been from an examining/treating physician to assist the

11 medical provider in deciding whether she was disabled; Ms. Allocco used white-out to correct

12 the doctor's representations; Dr. Bryman did not conduct a physical exam before rendering the

13 report; Ms. Allocco's ailments in support of her disability were numerous; and fibromyalgia

14 is difficult to define, comprehend or diagnose with certainty.

15     24.    The Court is satisfied with Plaintiff's credible explanations for each of the

16 allegedly suspicious events and activities. Significantly, many of the events and activities do

17 not require reconciliation with Ms. Allocco's claim for disability because of the strength of

18 the independent relevant evidence supporting her claim. Unfortunately, the Court has no

19 confidence that those at Met Life, to whom Ms. Vickery provided her findings and

20 conclusions, properly and thoroughly investigated the disability issues. Rather, they ceased

21 objectively evaluating the evidence after Ms. Vickery's report was submitted. The only

22 explanation the Court can find for this conduct is that early on Met Life decided she was not

23 disabled in part because of the suspicion that emerged from a variety of events and activities.

24 This decision was immutable such that Met Life ignored later accumulated controverting

25 information and evidence. There appears to be no other acceptable explanation for this

26 conduct in light of the breadth and depth of Ms. Vickery's evaluation and the failure to give

27 substance to Ms. Vickery, the only person at Met Life who had personal contact with Ms.

28

1  Allocco. Thus, she was the only person at Met Life who had evaluated the ever important
2  credibility issue.[4]

3      25.    The Court notes that Ms. Vickery concluded that Plaintiff was disabled based
4  solely upon fibromyalgia, an illness of which she had experience and knowledge as a nurse.
5  Hence, the finding of Ms. Allocco as disabled was fully supported by significant, reliable,
6  experienced opinions.

7      26.    It is axiomatic that Plaintiff's disability benefits do not require that she
8  specifically "categorize" her disability as physical or mental or emotional. (Vickery Affidavit,
9  10/15/02, page 107, lines 13-24). Ms. Vickery recognized this, and made mention of it. The
10 Plan specifically allows disability to be established through either physical and/or mental
11 conditions.

12      F.    Met Life's Decision and the Appeal Process.

13     27.    After Met Life reached the intractable conclusion that Ms. Allocco was not
14 disabled, she was encouraged, arguably in earnest, to engage in an appeal process, which
15 encouragement proved shallow. Further, if criteria for evaluating the credibility of the
16 claimant are applied here, Ms. Allocco has more than met the mark. Her statements and
17 explanations of her illnesses were consistent; she persistently exclaimed that she could not
18 perform her work functions; no evidence detracted from her self-evaluation; she persistently
19 sought and engaged in the prescribed course of treatment for her ailments; the detail with
20 which she described her symptoms is remarkable. The Court is puzzled and troubled by Met
21 Life's failure to explain how the Plaintiff's copious, rational, and highly descriptive notes
22 could be dismissed or explained by Met Life as not persuasive on the disability issue. Fair,
23 885 F.2d at 603-04.

24     28.    Ms. Vickery appropriately attempted to intercede at this stage with the hope of
25 persuading Dr. Hopkins and Marie Ciaburri that the medical evidence supported Plaintiff's

26

27     [4]    It is noted that Ms. Vickery expected to receive the file back from Ms. Ciaburri,
the claims manager. Mysteriously, after Ms. Ciaburri reviewed the file, she did not return
28 it to Ms. Vickery, but "left her out of the loop" and sent the file to Dr. Hopkins.

1   claim.  But Dr. Hopkins refused to adjust or change her report.  The Court finds that Ms.

2   Vickery's later concurrence with Dr. Hopkins's opinion was not a consequence of an

3   enlightenment that came to her as the result of reading the opinion. Rather, it was a resolution

4   and recognition that her duties and responsibilities had ceased and deference was required.

5          29.    Despite Ms. Vickery's advice to claims supervisor Ciaburri that the medical

6   evidence supported a finding of disability, Ms. Ciaburri, who had no medical background or

7   expertise in any of the possible disabling conditions, without supportable evidence, rejected

8   the opinion of her nurse consultant. No reliable explanation for this decision surfaces except

9   for again, a possible rigid adherence to her initial impression of the suspicious nature of the

10  claim.

11         30.    Certainly, the report of Mayo Clinic ENT doctor, Dr. Marion, dated June 9,

12  2000, reflecting no disability due to pariotitis, was a proper differential diagnosis that

13  Plaintiff's salivary duct stone was not the reason for Plaintiff's disability.  But it did not

14  support Met Life's decision to shut the door on all other disabilities.

15         G.     The Burden of Proof.

16         31.    It is undisputed that Met Life's analysis was to determine whether Plaintiff was

17  capable of performing **all** of her material job duties, but that if Plaintiff was unable to perform

18  **any** of her material job duties, she satisfied the criteria for disability.  To the extent there may

19  have been questions whether Plaintiff could still perform some of her job duties, it is beyond

20  dispute that there were some mandatory duties which Plaintiff could not perform.  Met Life

21  offered no evidence that Plaintiff could perform even one of her material obligations.  Due

22  to her documented deficiencies in many areas, including short term memory loss,

23  concentration failure, word finding inabilities, poor cognitive thinking speed, as well as the

24  more physical disabilities related to the fibromyalgia, such as fatigue and pain, Plaintiff

25  clearly met the criteria for disability under the terms of the Plan as of May 5, 2000.

26         32.    The Court also finds that prior to the neuropsychological testing conducted on

27  July 11, 2000, significant anxiety and depression surfaced, and these conditions then satisfied

28

1    the criteria for disability under the Plan.  In addition to her fibromyalgia, Plaintiff suffered

2    from psychiatric problems of sufficient severity to require that she not work.  Whether the

3    psychiatric condition occurred jointly with her fibromyalgia (which is recognized in the case

4    law), or whether it arose independently, it accelerated to a diagnosis of major depression

5    which is very disabling.  See DSM-IV at 369.

6        33.     The Court finds that Plaintiff met the definition of disability according to the

7    terms and conditions of the Plan for the entire six month time frame commencing May 2, 2000

8    and continuing on for 26 weeks thereafter and, for that reason, Plaintiff is entitled to recover

9    full benefits for the entire 26-week period.  The stipulated amount of the unpaid contract

10    benefit is $9,128.07.

11        **H.**     Continuation of the Appeal Process.

12        34.     Met Life sought an outside review of Plaintiff's claim by Dr. Amy Hopkins,

13    pursuant to an ongoing relationship between Met Life's disability claims department and Dr.

14    Hopkins.  Before retaining Dr. Hopkins, Met Life made no attempt to contact any of

15    Plaintiff's treating physicians or supervisors at work to inquire about the merit of Plaintiff's

16    claim. Unfortunately, Dr. Hopkins also made no attempt to contact or consult with any of Ms.

17    Allocco's physicians who found her disabled,  to evaluate the objectivity of their diagnoses.

18        35.     Dr. Hopkins's Medical Review Summary dated June 16, 2000 notes in the

19    "History" section that medical records report Plaintiff as having, at a minimum, the following

20    26 symptoms or diagnoses:

21               a) "severe fibromyalgia"

22               b) FMS

23               c) insomnia

24               d) chronic pain

25               e) fatigue

26               f) weakness

27               g) inability to concentrate

28

h) talking is tiresome/throat muscles get sore

i) objective finding of lower back pain in response to palpation;

j) limited range of motion on flexion

k) multiple tender points

l) Ms. Allocco can only sit for one hour a day;

m) Ms. Allocco can only stand for one half hour a day;

n) Ms. Allocco can only work for zero to thirty minutes per day;

o) Ms. Allocco cannot drive;

p) She can "never" lift or carry;

q) She cannot use her hands for fine finger movements;

r) Left peritoditis;

s) Sialolisthiasis;

t) Rotator cuff tendonopathy;

u) Diffuse soft tissue tenderness;

v) Give way weakness;

w) "Notably depressed;"

x) Vertigo;

y) Dix-Hallpike maneuvers for vertigo were positive;

z) "Close to bedridden."

Unfathomably, Dr. Hopkins reported that nothing was documented in Plaintiff's medical records that would "necessarily" impair Plaintiff from working and/or included no documentation of "significant" impairment.[5]

---

[5]     Use of the word "necessarily" obviously means Dr. Hopkins's opinion was not conclusive, and at least requires independent effort on her part to conclusively determine Plaintiff was/was not disabled.

1       I.      Dr. Hopkins's Standard of Proof.

2       36.     Dr. Hopkins used an improper proof standard. Though it is incapable of precise

3   analysis, implicitly she did not apply the preponderance or more likely than not standard.

4   Obviously, claims supervisor Marie Ciaburri's reliance on Dr. Hopkins's report perpetuated

5   Dr. Hopkins's failure to apply the correct standard. As counsel for Met Life accurately stated,

6   Ms. Ciaburri was concerned that Ms. Allocco had "multiple conditions potentially affecting

7   her claimed disability, that there were differences in multiple attending physician forms

8   provided by Dr. Bryman, and that it had taken several attempts to obtain the requested

9   information from Dr. Bryman" which compelled her to seek a physician's opinion. (Def's

10  Revised Facts and Law at 10).   There is no evidence in the record that the substantial

11  additional information swayed Ms. Ciaburri in favor of finding disability.[6] But in the period

12  of approximately one week before the claim was denied on June 20, 2000, there are numerous

13  references in the claim file where Met Life acknowledges its need to request additional

14  information and/or medical records concerning Plaintiff's medical treatment (all references

15  are found in Exhibit 53):

16                  a) On June 12, the claim handler notes that "Met Life needs to determine if
                    employee is engaged in water aerobics as recommended or stationary bike
17                  exercise (as advised by Dr. Ganter) as well as prescribed therapy. Will need to
                    follow for progress." (Page 14, 15:56)

18
                    b) In the same note, nurse consultant Vickery **noted** that the medical records **do**
19                  support her physician's recommendations of Plaintiff's restrictions and
                    limitations, the claim note stating "**medical supports R/L's** with need to
20                  continue to monitor progress."(emphasis added). Met Life claims personnel
                    wrote they would monitor Plaintiff's progress "to identify earliest point for
21                  consideration for patient transitional return to work." (Page 14, 15:56)

22  _____

23          [6]     It is noteworthy that unless the evidence suggests that the claimant and treating
    doctor were collaborating to deceive Met Life, this fact is not a reason to support failure to
24  establish disability. It is common knowledge, to which the Court believes both counsel
    would agree, that physicians are always busy treating the sick, and painfully tardy in
25  preparing written reports for patients. It is plainly erroneous to attribute to Ms. Allocco a
    doctor's indifference to the urgency of preparing a disability form. Though not controlling,
26  the Ninth Circuit found in Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998), that "[u]nless
    there is affirmative evidence showing that the claimant is malingering, the Commissioner's
27  reasons for rejecting the claimant's testimony must be 'clear and convincing.'"
28

c) On June 14, Met Life's "action plan" was to "contact employee to determine if she has started physical therapy program as recommended by Dr. Ganter and as noted by Dr. Bryman." The claim handler was also going to "request infectious disease specialist assessment from medical records department." (Page 15, 08:59)

d) Also on June 14, Ms. Vickery's "action plan" was reviewed by the "CS" (claims supervisor Marie Ciaburri) and the claims supervisor "concurred" with both the need for, and the plan to obtain, these additional medical records. (Page 15, 10:27)

e) Further, on the same date of June 14, the claim handler notes that Met Life intended to call Plaintiff to see if she had started her physical therapy program and obtained the details concerning her physical therapy. Met Life's medical records department was also asked to obtain any physical therapy notes after May 31 if available. Ms. Vickery was going to "contact employee to see if she can expedite the request for medical records." (Page 15, 10:29)

f) On the same date, June 14, Met Life elected to "request Mayo Clinic med records and identify their medical doctor assessment." (Page 15, 10:53)

g) But the record establishes that on June 15, Met Life learned from conversations with Plaintiff that she had started her physical therapy pursuant to Dr. Ganter's *order* 2 days earlier. Met Life had obtained the name and phone number of the specific physical therapist. (Page 16, 09:30)

h) On June 15, Met Life requested that the physical therapy office fax their records to Met Life. (Page 16, 16:49)

37.    In spite of:  a) Met Life's repeated acknowledgments of the need to obtain additional medical and therapy records from June 12 to 15; b) its nurse consultant's written **and** vocalized opinion that Plaintiff's "restrictions and limitations" were supported, and that Plaintiff satisfied the Plan criteria for disability; **and** c) supervisor Ciaburri's purported "concurrence" in the "action plan" to obtain more records; no additional records were sought and reviewed, and on June 16,  the claim file was given to Dr. Hopkins for her review.

J.    Met Life's Decision Following Dr. Hopkins's Report.

38.    On June 20, 2000, Dr. Hopkins returned the file to the claims department with her report that "in the absence of functional testing," there was no documentation to substantiate an inability to work.  By 9:49 a.m. on that same day, and without waiting for receipt of any of the additional medical records which its nurse consultant and claims supervisor had deemed important and necessary, Plaintiff's claim was denied.  There is no question that Met Life relied exclusively on Dr. Hopkins's opinion to deny benefits to

- 17 -

1  Plaintiff despite an acknowledgment that more investigation was called for.  Conspicuously,

2  Met Life's denial letter was dated June 20, 2000, the exact date that Dr. Hopkins returned the

3  claim file and provided her opinion to the claims department.

4        39.    Met Life's intransigence is clear.  After receiving Dr. Hopkins's report again,

5  no one from Met Life contacted or made an effort to contact Plaintiff or any of her multiple

6  treating physicians to either:

7              a) send them Dr. Hopkins's report for their review and comment; or

8              b) telephonically contact them to review Dr. Hopkins's opinion.

9  Met Life clearly had Dr. Kelley's initial May 18, 2000 office note in its claim file.  But Dr.

10  Hopkins's report of June 16, 2000 (Exhibit 56) wrongly states in the "Comment" section that

11  "no psychiatric evaluation was documented," which demonstrates either that Ms. Ciaburri,

12  who referred the file to Dr. Hopkins for review (Exhibit 55), did not provide Dr. Hopkins with

13  Dr. Kelley's May 18 psychiatric assessment, or the **unlikely** circumstance that Dr. Hopkins

14  missed it or ignored it.

15        K.    Dr. Kelley's Report and Findings.

16        40.    The videotaped deposition testimony of psychiatrist Lee Ann Kelley, M.D.

17  illustrates that:

18              a) Dr. Kelley was credibly emphatic about her finding and opinions.  The

19              neuropsychological  testing  done  on  July  11,  2000  by  Mayo's

20              neuropsychologist, Dr. Osborne, produced objective findings which were

21              "clearly abnormal."

22              b) The neuropsychological testing indicated that her then-existing IQ was

23              "markedly low" and showed "severe problems" as to verbal fluency and verbal

24              cognitive speed.  Dr. Kelley stated that Plaintiff's learning efficiency and

25              "immediate recall" were severely impaired.

26              c) Plaintiff's deficit in verbal fluency would interfere with, if not completely

27              preclude her from being able "to carry on a conversation and to make herself

28

understood, to be able to finish sentences and, [to] be able to basically express herself verbally with language." According to Dr. Kelley, Plaintiff would not be able to deal with American Express customers that call in with problems.

d) She showed a severe deficit in cognitive processing speed, which indicates how fast an individual can think and process information.

e) When Dr. Kelley saw Plaintiff in February of 2001, Plaintiff's psychiatric treatment was not finished. She needed to have additional treatment but was financially precluded from doing so.

f) Plaintiff's pain caused by all of her various physical conditions was real pain.

g) Dr. Kelley testified she had "no doubt" that from the time she started treating Plaintiff in May 2000 until her last treatment date in February 2001, Plaintiff was unable to perform the duties of her position with American Express.

h) Dr. Kelley testified that it is rare to find anyone so psychiatrically disabled that she is unable to work, but that Plaintiff was an exception "because she was so severely impaired."

i) Dr. Kelley believed that the financial stress and anxiety caused by the failure to provide necessary disability benefits "extremely compounded" her anxiety problem and inhibited her from responding to treatment.

j) Dr. Kelley found that the denial of claim benefits also "severely impacted" her marital relationship with her husband.

k) Dr. Kelley testified that she purposely drafted her letter of July 30, 2001 to Met Life using strong affirmations and evidence of Plaintiff's disability to communicate to Met Life that its position was "very wrong." Dr. Kelley's letter was lost, destroyed or deemed irrelevant.

l) Dr. Kelley indicated that Dr. Osborne would have commented, or brought it to Dr. Kelley's attention if there were any "validity" concerns with the results of the neuropsychological testing performed on the Plaintiff. Dr. Kelley

1  testified that, if anything, Plaintiff severely **understated** her symptoms and

2  problems which would be consistent with her disease process.  Obviously, if

3  she was malingering or motivated by secondary gain, she would have

4  **overstated** her symptoms.

5  m) Indeed, Dr. Kelley resolved that Plaintiff was at all times "desperate" to get

6  better.[7]

7  **L.**    Plaintiff's Submission of Facts on Appeal.

8  41.    In her appeal, Plaintiff more than adequately explained her physical and

9  psychiatric limitations justifying her inability to perform all of her job duties at American

10  Express. In particular, the following passages from her letter are poignant:

11  . . . my livelihood (no savings account), at my job I love so much, did depend
on it.  It was such a strain to hold myself up, that increasingly from that

12  infection, I'd sigh between even the simplest of calls and put my head down on
my desk if there was a break between calls.  People kept asking if I was OK; I

13  said "NO!"  They said, "You belong out sick!" and I said, "I know, but it would
be unexcused– they don't know what's wrong with me!"  Most of the time, I

14  couldn't even talk to my co-workers, I was so drained.  (Since I'd had
fibrositis/fibromyalgia for over 15/20 years, I didn't realize it could become that

15  severe, if exacerbated by illness...until I finally broke down and couldn't make
it to work, even if a million dollars depended on it– and I started talking with

16  professionals).  I hung on for another month after Acute Illness visit, until the
first of May, when I finally collapsed.  Not only was I so weak that I didn't

17  even have the strength to hold my husband's hand, or hardly walk at all . . . but
at the same point, I had almost no ability to concentrate on what I was doing,

18  and as if I had a "fixed gaze" straight ahead, with very little peripheral, or even
general, alertness!  As weak as I'd been, this was a sudden and major drop,

19  physically and mentally, both at once, and I was terrified!  Doctors said I
appeared "anxious" (I was scared! And straining), and "depressed" (I was in

20  tears, desperate for help!  My concentration became impaired while I was still
at work; cardmembers began having to finish sentences for me, then before

21  May hit, I was having to put them on "hold" to think what (common) screen to

22

23

24  [7]    Plaintiff discontinued the prescribed drugs because of the side effects.  Met
Life attempted to make much of Plaintiff's failure to take the drugs as if the non-compliance

25  was intentional and unjustified. Met Life also saw concern with Plaintiff's failure to attend
an appointment with Dr. Kelley. But Dr. Kelley explained that this behavior was not unusual

26  even for someone who never suffered emotional or mental problems. Because of the stigma
attached, such people are more comfortable with a physical explanation for their problems.

27  In fact, there is another reason why Plaintiff would cling to a physical explanation.
According to Dr. Kelley's report, Plaintiff's mother suffered severe mental problems.

28

go to!  Within days, I had my first BPPV episode, where the room wouldn't stop spinning, resulting in nausea and vomiting.  It scared us to death).

. . . .

From page 4:  With BPPV vertigo, dizziness and inability to concentrate and focus between attacks, a "fixed gaze" (semi-awareness/alertness), inability to turn head quickly if necessary, or bend over to tie shoes, or even watch TV without getting nauseated (let alone computer screens at work), extreme concentration problems, etc. . . there is no way a person could go and work at a phone/computer customer service job–or any job.

. . . .

From page 5:  The attached concentration test results were done and analyzed in the psychiatric department before I saw Dr. Kelley.  The tests show severe impairment, possibly caused by emotional or organic factors, so Dr. Kelley is first trying an anti-depressant which I can tolerate.  I've always been the first one done completing puzzles, etc., but I just stared sometimes; once, during the test, I was so embarrassed and frustrated (not to mention worried) that I actually cried in front of the doctor.  And it still gets to me when I realize I'm just staring straight ahead, like when sitting, or walking on sidewalk.  This, as well as the examples at top of page, definitely hinder my ability to do my job right now (I have difficulty just making a sandwich)!  I've had many life stresses; I believe that with medication, stress-free time to improve would get me back to functionality.  I am getting increasingly depressed about [the] entire situation.

. . . .

From page 7:  I can't seem to help being so worried over my job and pay, which has been hard on my muscles and sleep (even coordinating this appeal, in my condition, has been a strain).  But I'm doing everything I can to help myself; took fibromyalgia class, listen to biofeedback relaxation tape, use TENS unit, and more importantly, do my exercises/movements.  It seemed like I started to feel slightly stronger and clearer-thinking, but this claim denial seemed to set me back.

. . . .

From page 7:  At the beginning of May, all of a sudden, I had to stop because I was too weak to get up the stairs.  I had to contort myself and put my feet up while waiting in doctors' offices, to take strain off my back, and even writhing in the car, changing positions because no position or muscle group could hold me up very long, always propped up.  In bed, I couldn't even hold my husband's hand, unless my hand was lying effortlessly, palm up, with his hand on mine.  Another thing is that I haven't been able to make love to my new husband; I'm hardly any company otherwise since it's too hard on me to go out (I need to lie down so often).  My husband has a son from his previous marriage, who wed on July 8th; my husband, Father-of-the-Groom, had to go alone, being asked where his new bride is.

M.     Dr. Hopkins's Second Report.

42.    On August 17, after receipt of Plaintiff's written appeal and new medical records, Met Life had the same physician, Dr. Hopkins, review the file and offer another opinion. Inexplicitly, Dr. Hopkins's opinion was unchanged.

Without a doubt, Met Life again failed to provide Dr. Hopkins with highly material information, or Dr. Hopkins ignored it.[8] On this second occasion, Met Life failed to provide Dr. Hopkins with Plaintiff's neuropsychological test results dated July 11, 2000. These results demonstrated moderate and severe "cognitive dysfunction" in numerous categories of performance directly relevant to Plaintiff's ability to perform the material duties of her job.

43.    Dr. Hopkins's review of the evaluation by Dr. Kelley which documented that the employee's "problems were primarily psychiatric. . ." infers one or more of the following: 1) that Dr. Hopkins viewed Plaintiff's psychiatric problems as having greater clinical significance compared to the fibromyalgia concerns; 2) that Dr. Hopkins apparently believed that any psychiatric or mental impairment could not form the basis for disability and/or 3) that Dr. Hopkins had not considered, or was not instructed to consider, the psychiatric component of Plaintiff's claim.

Plainly, the above finding by Dr. Hopkins required that Met Life either advise Dr. Hopkins that she needed to consider Plaintiff's psychiatric problems because the Plan allows for such disability or, Met Life should have realized that Plaintiff's psychiatric disability status had not been fully analyzed or assessed, requiring further input from an expert qualified in psychiatry.

N.     Ciaburri's Improper Handling of the Report.

44.    The Court finds that Marie Ciaburri had actual knowledge of the neuropsychological testing conducted by Dr. Osborne on July 11, 2000 but failed to provide this critical evidence to Dr. Hopkins which, if not controlling, was very material to the second

---

[8]     Because of her reputation, experience and professional status, the Court seriously doubts that she ignored the material information at issue.

assessment of Plaintiff's disability status. Ms. Ciaburri's actual knowledge was demonstrated by the following:

a) <u>The neuropsychological report was available in Met Life's claim file nine days after it was prepared.</u> The report bears a fax stamp with a date of July 20, 2000, at the top of the report, i.e., "sent by Mayo Clinic." While such a notation implies Met Life's receipt of the report, the fax "date stamp" also reflects that it was sent from area code "480" and "301" the prefix number from which the document was faxed. The Court takes judicial notice from examining the locally published Qwest Dex "Phoenix Metro Business White Pages" that Mayo Clinic's phone prefix in Scottsdale is "301."

b) <u>The claim file contains more evidence that the report was available to Met Life.</u> The diary of July 21, 2000 at 7:49 a.m. by Ms. Vickery indicates that upon her arrival at work on the morning of July 21, there were additional medical records for her to review. This reference to new records is consistent with the fax "sent by Mayo Clinic" on the preceding afternoon of July 20.

c) <u>Plaintiff's appeal referenced the report.</u> Plaintiff's appeal letter dated July 24, 2000 (Exhibit 7) clearly refers to the neuropsychological test results enclosed as attachments to her appeal letter. The information in the "psychiatric" section of the letter (page 5) mentions "concentration tests" and "severe impairment" findings that cannot reasonably relate to evidence other than the neuropsychological testing conducted by Dr. Osborne.

d) <u>Met Life stipulated that the neuropsychological test results were an attachment to Plaintiff's July 24 appeal letter.</u> Ms. Vickery stated that the handwritten notation "Ciaburri" on the front of Plaintiff's appeal letter shows that Plaintiff's appeal letter went directly to Marie Ciaburri which means that the "attached" test results were received by Ms. Ciaburri.

e) Ms. Vickery's trial testimony. Further, Ms. Vickery testified that she never saw the neuropsychological test results until her preparation for trial. Thus Ms. Ciaburri received the report, not Ms. Vickery. Further, Ms. Vickery expressed surprise that she had not been given the report because her advice was considered by Met Life as material to the decision.

O.     Dr. Hopkins's Handling of the Report.

45.     Dr. Hopkins states in her "Comment" within her August 17, 2000 report (Exhibit 58), "[Ms. Allocco] was diagnosed w/a rotator cuff tendonopathy, but no significant dysfunction was documented on exam." This statement contradicts the therapy records in Exhibit 29 which Dr. Hopkins had in her possession. There, therapist Ostransky stated that Plaintiff had "limited left shoulder range of motion at end ranges of elevation due to pain and impingement."

On August 17, when Ms. Ciaburri sent the file to Dr. Hopkins for a second review, Ms. Vickery's testimony provides a basis to conclude that Ms. Ciaburri deliberately avoided providing Ms. Vickery with the medical records in the claim file which were even more extensive than the initial evidence. The claim diary reflects that on August 8, 2000, Ms. Ciaburri stated that after reviewing the file she would "forward to NC [nurse consultant Vickery] for review" which she failed to do. She "elected to forward the file to OPC [outside physician consultant] Hopkins for review." Ciaburri intentionally left Ms. Vickery out of the decision-making process on the second review of the file. As a result, Ms. Vickery's only task was to summarize Dr. Hopkins's findings after she filed her report. Met Life offered no explanation for by-passing Ms. Vickery when Ms. Ciaburri knew that Ms. Vickery had previously found Plaintiff disabled. Ms. Vickery's report very conspicuously details Plaintiff's disabled condition.

P.    Plaintiff's Continuous Efforts to Establish Her Disability and Met Life's Continuous Efforts to Decline the Claim.

46.    On August 22, 2000, Plaintiff called to find out the status of her claim and advised Met Life that in the absence of receiving her claim payments she was "facing eviction." On the next day, August 23, the denial status of the short-term claim was noted and the long-term claim file was closed.

47.    Met Life had a specific case manager assigned to monitor the potential long-term disability claim from the outset of Plaintiff's submission of her short-term disability claim.  The claim diary reflects that the long-term case manager "closed" the long-term disability file on August 23, 2000, based upon Met Life's second denial of the short-term disability claim.  In short, it is clear that Met Life was actively monitoring the status of the short-term disability claim because of its impact on Met Life's need to financially fund any future long-term disability benefits.

48.    The reference in Dr. Ganter's May 11, 2000 medical note that Plaintiff "did not raise any concerns regarding work" is of no value because it assumes that either he asked her or she should have raised such concerns.

49.    Ms. Vickery's assessment is accurate. All of the purported "concerns" early on were resolved and the medical evidence and opinions of Plaintiff's doctors fully supported Plaintiff's claim for disability.

50.    Met Life summarily denied the claim upon receipt of Dr. Hopkins's opinion, without providing Plaintiff or her treating physicians with an opportunity to examine or rebut the findings made by Dr. Hopkins.  While the Court is not convinced that any objective or well-reasoned rebuttal would have made a difference to supervisor Ciaburri, Ms. Ciaburri never gave Plaintiff an opportunity.

51.    In addition, Ralph Allocco testified that by approximately August 2000, the vitality, companionship and intimacy of their marital relationship had ended.  Aside from Met

1  Life's failure to rebut this evidence, the Court finds Ralph Allocco's testimony to be credible

2  as well as consistent with the facts and evidence presented to the Court.

3      Q.    Plaintiff's Faxed Letter.

4      52.    Plaintiff's letter to Met Life dated August 31, 2000, was faxed just a few days

5  after Plaintiff's claim had been denied a second time.    The letter is replete with highly

6  relevant information of the effect of the denials of her claim:

> From page 1: "When my claim was first denied, Marie Ciaburri said that what
> I needed were concentration tests to document the severe mental impairment
> and physical impairment testing; I did both. It has been a month since I sent the
> appeal, painting a clear picture of what I've been going through, and doctors'
> test results showing proof of each of the diagnoses. Last week, the last time I
> spoke with Marie Ciaburri, she stated that she had completed her
> recommendation and needed just one more person to run it past, that I should
> check with her the following day. So, of course, she could not tell me of her
> decision, I thought; and it didn't seem like it was [necessary] to go to the
> Formal Appeals Board because I would think that would take longer than a day.
> Her voice was especially cheerful, unlike what you would expect from someone
> denying your claim, especially since she knows we're facing eviction (no
> paycheck). This week, she left me a message that I'd been denied again.
>
>                                . . . .
>
> From page 2: I've worked hard at being a good employee these years, and now
> that I'm this sick, I can face eviction, etc. – and even lose my job (if not
> approved, I'd be AWOL).  Because of all this extra burden on me, the
> psychiatrist has referred me to psychologist for help coping. Again, I would
> like to go on record, stating that this situation with Met Life (pay/job/getting
> help to do this), this tremendous stress and strain . . . makes my condition
> worse, not helping me to get better and back to work (affects sleep and
> fibrositis, etc., and I can tell the concentration is extra-poor right now at the
> time of [the] second denial of my claim when rent is due with no way of paying
> it, etc.). If it were humanly possible to do my job, I'd BE there (at work)!!! I'd
> always believed that when I couldn't be, I could count on my benefits.
>
>                                . . . .
>
> From page 4: As weak as I am, I've had my hands full, just doctoring – but
> I've had to get up in the middle of my sleep cycle to call Met Life (in earlier
> time zone) many times, with this situation making me too upset and worried to
> get to sleep or get back to sleep. I need this time to get on top of my muscle
> situation, but this major, major pressure is not allowing me."

24     53.    On November 8, 2000, Met Life had Plaintiff's disability status reviewed by a

25  psychiatrist, Dr. Jay Lasser, who exhibits a bias in favor of Met Life because he is paid by Met

26  Life to review files and provide opinions for Met Life.  Dr. Lasser did not interview or

27  examine Plaintiff and only reviewed various medical records which Met Life provided to Dr.

28  Lasser. The Court notes that Dr. Kelley's very recent opinion letter to Met Life dated October

1   26, 2000, a letter highly favorable to Plaintiff, was not provided to Dr. Lasser for his review
2   and consideration.   The Court also notes that after Dr. Lasser issued his report which
3   specifically stated he needed current information from Dr. Kelley before determining
4   Plaintiff's disability, again Met Life failed to provide Dr. Kelley's material report to another
5   doctor evaluating the case.

6          R.      Dr. Lasser's Opinions.

7          54.     Dr. Lasser's opinions, both as stated in his written report and at deposition, not
8   only failed to support Met Life's decision that Plaintiff was not disabled from her job duties
9   but actually supported Plaintiff's contentions.

10         55.     Dr. Lasser agreed with Dr. Kelley that patients with Plaintiff's anxiety disorder
11  often refuse to take the psychotropic medications prescribed by their psychiatrist because the
12  patient believes that they are physically ill and not psychiatrically ill.  As Dr. Lasser's report
13  states, these patients "almost always" report extreme side effects to the medication.

14         56.     Dr. Lasser acknowledged that if Plaintiff's reported symptoms of vertigo and
15  dizziness **were accurate**, these symptoms would impair Plaintiff's ability to concentrate and
16  focus at her job.

17         57.     Amazingly, Dr. Lasser never disputed the findings of the neuropsychological
18  testing conducted by Dr. Osborne at Mayo, including the findings of moderate to severe
19  impairment of Plaintiff's cognitive abilities, short term memory, and poor concentration and,
20  that **if the findings were accurate**, Plaintiff could not work.

21         58.     Dr. Lasser agreed that the sleep deprivation Plaintiff was experiencing is one
22  of the expected symptoms of Plaintiff's diagnosis of anxiety disorder and depression.

23         59.     Dr. Lasser was asked by Met Life to determine Plaintiff's disability status as of
24  November 8, 2000, a date not within the 6-month disability period from May 5, 2000 to
25  November 7, 2000.  Aside from this, Dr. Lasser was unable to provide Met Life with an
26  opinion on whether Plaintiff was disabled **as of November 8, 2000** or at any other relevant

27

28

1  point in time.  Dr. Lasser was unable to medically refute Plaintiff's contentions that she was
2  disabled.

3      60.    Significantly, Dr. Lasser expressed a desire to consult with Dr. Kelley regarding
4  Plaintiff's clinical status as of November 8, 2000, but he failed to do so.  In his favor, Dr.
5  Lasser claims he made a call to Dr. Kelley, but she claims that no call was ever received.  A
6  resolution of this factual dispute is immaterial.

7      61.    Dr. Lasser should have made repeated attempts to contact Dr. Kelley because
8  of the critical nature of her opinion. Instead he followed Met Life's instruction to simply "file
9  his report."  Even though Dr. Lasser told the Met Life case manager, Judith Rose, that he
10 found it "significant" that he talk to Dr. Kelley or else he would be unable to express an
11 opinion one way or another on the impairment issue, Ms. Rose indicated that she was under
12 a "deadline" and that he should just finish the report without a decision on disability.

13     62.    Dr. Lasser admitted that had Dr. Kelley advised him of her opinion that Plaintiff
14 was disabled, his conclusions would not even be a "close case".  Of course, Dr. Kelley's
15 opinions obviously should have influenced his opinion.

16     63.    There is no question that Plaintiff's claim for disability involved the two
17 components of fibromyalgia and its related symptomatology as well as the psychiatric
18 component.  However, Met Life only analyzed Plaintiff's appeal by requesting an opinion
19 from Dr. Lasser, a psychiatrist.

20     64.    The Court has reviewed Ms. Rose's appeal denial letter dated November 20,
21 2000 and finds that there are multiple statements of fact in the denial letter that indicate a
22 deliberate intent to confuse and misinterpret Plaintiff's claim including:

23         a) You [attorney Muirhead] noted that the psychological testing was performed on
           7/11/00.  However, **it is unclear that this is so,** as there is no indication that Ms.
24         Allocco was seen subsequent to her 5/4/00 visit to Dr. Daley, when he referred her to
           Dr. Kelley for psychiatric follow-up. (Emphasis added).
25
   This assertion by Met Life is not only erroneous but the contention by Met Life of
26 "inadvertence or oversight" is unsupportable.
27

28

- 28 -

1    b)  Ms. Rose wrote that "our physician consultant questioned the credibility of Dr.

2 Bryman's physical capacity evaluation especially given the fact that Ms. Allocco advised Dr.

3 Ganter on 5/3/00 **that she had no problems at work**."  As previously discussed, this

4 statement does not accurately express what Dr. Ganter found.

5    c) Ms. Rose stated that "Dr. Lasser assessed that it could not be assumed Ms. Allocco

6 was impaired."  Nothing in Dr. Lasser's report of November 8, supports this statement.  Dr.

7 Lasser's actual comment was that having been unable to speak with Dr. Kelley, "I am,

8 therefore, **unfortunately** unable to comment on this question [whether Plaintiff was precluded

9 from work.]"  Clearly Ms. Rose's opinion is a distortion of Dr. Lasser's statement without a

10 finding.

11    65.    Ms. Rose did not provide Dr. Lasser with Dr. Kelley's recent assessment dated

12 October 26, 2000, though she had it in her possession.  The Court's finding of deliberate

13 concealment is corroborated by Dr. Lasser's testimony that he specifically told Ms. Rose that

14 without Dr. Kelley's input, he could not offer an opinion either way.  Simply, Dr. Lasser's

15 remarks to Ms. Rose reflecting a need for **current** psychiatric information should have alerted

16 her to provide the recent letter to him.

17    66.    Met Life's appeal denial letter of November 20, 2000 states that there is no

18 dispute that Plaintiff has fibromyalgia, i.e., "we do not dispute this diagnosis."  The indirect

19 admission by Met Life that Plaintiff had fibromyalgia required a careful analysis of the

20 symptoms associated with the illness in order to determine whether the fibromyalgia was

21 disabling.  Again, Met Life gave short shrift to Plaintiff's repeated complaints of depression

22 markedly corroborated by qualified practitioners and relevant medical tests.  Further, at no

23 time throughout the claim process did Met Life ever dispute any of Plaintiff's multiple

24 diagnoses including fibromyalgia, anxiety disorder, major depression, or benign paroxysmal

25 positional vertigo (BPPV).  Of course, of great significance is that Met Life never disputed

26 the accuracy of the results of Plaintiff's neuropsychological testing except to inaccurately state

27 that "validity" testing could have been done but was not done.  Obviously, it also could have

28

1   been done by Met Life. What is more, this effort to support Met Life's denial was not made
2   until March 2001, four months after the relevant time period had passed.

3        67.    Indeed, Met Life's own witness, Dr. Givens, admitted that a personal
4   examination of a disability claimant is "very important" when the nature of the disability is
5   psychiatric, and "you would need to see the patient to document these types of symptoms and
6   to document an evaluation, yes."

7        S.    Bad Faith and Punitive Damages.

8        68.    Assessing Plaintiff's claim for bad faith and punitive damages, the Court finds
9   in summary a clear and ongoing pattern of intentionally withholding of important medical
10  records from Met Life's consulting physicians, as follows:

11       1) Dr. Kelley's psychiatric note of May 18, 2000 was not provided to Dr. Hopkins
12           when she issued her first report on June 16, 2000;

13       2) The highly significant neuropsychological test results of July 11, 2000 were
14           withheld from the documents provided to Dr. Hopkins for her second review in August
15           of 2000;

16       3) Dr. Kelley's very recent October 26, 2000 opinion letter was withheld from Dr.
17           Lasser in connection with his November 8, 2000 review, even after Dr. Lasser advised
18           Ms. Rose that he could not offer an opinion without updated information from Dr.
19           Kelley.

20       69.    The Court finds that these repetitive instances of withholding documents from
21  Met Life's consulting physicians clearly support a finding that the withholding of information
22  was deliberate and intended to indirectly persuade the consulting physician in favor of finding
23  lack of disability. The Court again summarizes the evidence supporting bad faith as follows:

24       1) As stated, the repetitive pattern of withholding information, occurring each and
25           every time a consulting physician was asked to review the file, precludes a finding that
26           these "errors" were unintentional, especially when Met Life offered no testimony or
27           evidence claiming neglect or mistake.

28

2) The documents withheld on each occasion were, without question, some of the most highly material and critical documents concerning Plaintiff's medical status. The Court notes that only important documents were withheld, never innocuous ones.

3) As reflected elsewhere in these findings of fact, the referral forms to the consulting physicians often contained either negative insinuations or reminders of how the consulting physician was specifically not advised of the opinion of predecessor consulting physicians.

70.     Met Life's deliberate indifference is further evidenced by its physician consultant reports setting forth specific findings that should have alerted a conscientious claim handler that she had omitted material information from the information provided to Met Life's consulting physicians.  Dr. Hopkins's report of August 17, 2000 states: "No cognitive dysfunction was documented." Upon reading this, claims supervisor Ciaburri should have recognized that she had failed to provide Dr. Hopkins with the critical neuropsychological test results. Similarly, Dr. Lasser's report should have alerted Appeals Specialist Judith Rose that Dr. Lasser had not been provided with Dr. Kelley's recent opinion letter of October 26, 2000.

T.     The Injuries Suffered by Plaintiff.

71.     The denial of Plaintiff's short-term disability claim created significant stress on her marriage which had already been burdened by Plaintiff's medical problems.  Here, an actual percentage or allocation of Plaintiff's damages is directly attributable to the financial stress caused by Met Life's conduct, and Plaintiff need prove only that Met Life's conduct was a contributing factor to the extreme stress and anxiety which Plaintiff suffered.  In addition to Plaintiff's unrebutted testimony, the medical testimony and exhibits provide direct support for the causal relationship between Met Life's denial of Plaintiff's disability claim and Plaintiff's damages:

1) Dr. Kelley's office note of October 25, 2000, found in Exhibit 30, reflects that

Miss Allocco has been under a lot more stress so her anxiety level is higher. Her best friend died unexpectedly.  Her husband of 7 months is no longer supportive.  She said they have barely spoken in the last 2 weeks.  He is upset with her because she is not working and he is under a great deal of financial

1    stress.  She still has not gotten her short-term disability checks yet....her marital

2    problems are her main complaint today.  She says this is "really really hard on
     me" because her best friend and her husband are no longer available to talk [to]
     and she has no one else to talk to.

3
     2)  On page 2 of Dr. Kelley's October 25, 2000 report, Dr. Kelley specifically notes
4
     that Ms. Allocco's anxiety disorder "had been improving but now is worse with recent
5
     marital stress" and that Plaintiff's major depression "had somewhat improved, but
6
     again is worse due to marital stress."[9]
7
     These findings by Dr. Kelley that were made known to Met Life requires a finding that
8
     Met Life's denial of Plaintiffs' claim exacerbated Plaintiff's overall emotional stress, anxiety,
9
     and depression.
10
     72.     Dr. Kelley's opinion in Exhibit 13 indicates that Met Life's conduct not only
11
     dramatically increased Plaintiff's emotional anxiety and stress but also that it hampered her
12
     very ability to respond to treatment and recover:
13
         "At this point, her progress in treatment has been significantly affected by the
14       fact that she has not had any income in many months and is now facing dire
         financial problems, which markedly increases her stress level.  This is a serious
15       impediment to her recovery.  I am urging you to reconsider her request for
         short-term disability payments.  She is one of the more anxious patients I have
16       ever treated, and in no way has she been capable of resuming her job duties in
         recent months." (Emphasis added).
17
         "If [the appeal] is denied, she will lose her job and benefits.  She is still under a
18       tremendous amount of financial pressure." (Exhibit 30)

19     On page 11, Plaintiff states the effect of Met Life's failures as:

20       "This severe hardship has impacted us profoundly.  We have had to borrow
         from every conceivable source.  We've had to sell what we could, and even had
21       to pawn our wedding rings.  My husband worked hard to build credit, now
         tarnished.  He has had to work so much overtime, that I'm worried about his
22       health even more than before.  We have both had dental pain in more than one
         tooth, and he has swelling, but we have no money to go to the dentist.  We have
23       had to take from the foodbank, and we've had to return anything I'd stocked up
         on (pancake syrup to picture frames) to get fresh milk, fruit, etc.  Any cash
24       refunds would be used for gasoline to get to the doctor or for prescription co-
         payments, etc.  Even to make these copies and have it notarized and sent by
25       Certified mail, Mailboxes, Etc., agreed to hold my check until my husband's
         payday – this is just one example of having to constantly finagle.  My husband's
26

27       9       Of course, without the need for elaboration, Plaintiff's marital stress, if not
28   precipitated by her disability, was at least a significant factor regarding her disability.

paycheck is relatively small because child support is automatically taken out, and then he has an agreement to pay for his children's braces, etc. His kids had no Christmas present, and there is no visitation with his kids here for <u>weeks</u> because he is having to work overtime because of the desperate financial situation (working several hours extra every day, and working on his days off). The list goes on and on, not the least of which is the strain on our marriage. There is plenty of medical support for my claim, so please respond mercifully.)"

Plaintiff's statements in assessing both Met Life's conduct and Plaintiff's resulting damages is very credible.

73.   Ms. Allocco was additionally stressed by the fact that Met Life's denial of her claim could eventually and did lead to the complete loss of her employment. American Express took the position that Ms. Allocco was absent from work without cause and she was terminated.

74.   Mr. Allocco testified that the stress and anxiety which the two of them suffered from the loss of Ms. Allocco's income and not being paid disability benefits had a significant deleterious effect on their marriage. He testified:

"She became very irritable, very depressed, and I became very withdrawn and very depressed. I ended up, in August of that year, moving into the second bedroom, to where we didn't even sleep together, and from that point on, it was just – we were roommates from that point on. We couldn't communicate. We tried going to a therapist, but we just could not communicate. We couldn't do anything. I could not touch her, because if I touched her, it was too painful."

75.   Ms. Allocco testified that she and her husband experienced many financially humiliating and degrading experiences including:

1) Having to obtain "pay day loans" which caused significant interest and fees.

2) Her husband had to deplete his retirement funds with American Express.

3) The Alloccos had to pawn their new wedding rings that they had exchanged at their wedding in March 2000; rings having a value of approximately $1,300.00.

4) Ms. Allocco had to sell items of personal property such as antiques as well as turquoise and silver jewelry.

5) Ms. Allocco would return unused merchandise to stores for refunds to get money to buy food or gasoline.

6) The Alloccos had to receive charitable help from different churches as well as food banks.

7) Ms. Allocco testified that she would have to spend considerable time trying to "juggle" their limited resources to pay whatever unpaid bills would have the greatest priority, i.e., paying bills which would have the most serious consequences if not paid, such as having utilities shut off, etc.

The Court finds that the Plaintiff's financial and emotional suffering was caused by Met Life's conduct and was substantial. Further, the Court finds that Met Life's improper conduct contributed to Plaintiff's poor mental and physical condition.

## V.    Conclusions of Law

1.    A bad faith claim of one spouse lies only in favor of the spouse whose benefits were handled and denied. Fobes v. Blue Cross & Blue Shield of Arizona, Inc., 176 Ariz. 407, 861 P.2d 692 (1993). Thus, the only legal relief available to Plaintiff Ralph Allocco is his community property interest in the unpaid disability benefits, i.e., a 50% interest in the $9,128.07 benefit amount that was denied.

2.    The Court ruled prior to trial that in light of Met Life's failure to deny or refute Plaintiff's allegation that Met Life owed a duty to Plaintiff to act in good faith until such time as the final pretrial order was drafted, and in light of the fact that Plaintiff and her counsel clearly relied upon Met Life's failure to deny it owed such a duty, which Plaintiff alleged in her Complaint, Met Life waived any right to assert that it owed no duty.

3.    Arizona law on proximate cause is set forth in Smith v. Johnson, 183 Ariz. 38, 899 P.2d 199 (1995):

"A plaintiff must show a reasonable connection between the defendant's act or omission and the plaintiff's injury or damages." Robertson v. Sixpence Inns of America, Inc., 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990). "The defendant's act or omission need not be a 'large' or 'abundant' cause of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." Id. (citing Ontiveros v. Borak, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983)). To establish **proximate cause,** a plaintiff "need only present probable facts from which the causal relationship reasonably may be inferred." Id.; see also Wisener v. State, 123 Ariz. 148, 150, 598 P.2d 511, 513 (1979) (stating that plaintiff need not negate entirely the possibility that defendant's conduct was not a cause). The question of **proximate cause** is usually a question of fact for the jury. Robertson, 163 Ariz. at 546, 789 P.2d at 1047. (Emphasis added.)

The quantum of proof which Plaintiff needs to establish a "reasonable connection" between Met Life's conduct and Plaintiff's injuries or damages has been satisfied by the

- 34 -

1   Plaintiff.  The Court finds that Met Life's conduct was a significant cause of her injuries.

2   Met Life's conduct increased Plaintiff's stress and anxiety above what would be reasonable

3   from illness and inability to work.  The testimony of her treating physicians, as well as

4   statements in their medical charts, unquestionably support causation between Met Life's

5   conduct and Plaintiff's stress and anxiety.  Furthermore, the evidence is undisputed that

6   Met Life's conduct played a role in Plaintiff's failure to receive medical treatment from her

7   physicians which may have reduced her level of anxiety and stress.  Indeed, Dr. Kelley

8   opined that effective medical treatment was hampered by Met Life's conduct.

9       4.      Both Dr. Bryman and Dr. Kelley initially thought that Plaintiff would need to

10  be away from work less than six months.  However, as future events unfolded, i.e., after the

11  claim was first denied and then re-denied, Dr. Kelley's opinion dramatically changed

12  because she assessed Plaintiff as one of the most seriously impaired patients she had ever

13  encountered in her professional career.  The record indicates that Plaintiff's physical health,

14  i.e., her dizziness, vertigo, fibromyalgia, etc., did not get worse over the six month period

15  of time and, in fact, Plaintiff herself acknowledged that her BPPV and problems with

16  focusing her eyes began to improve by July and August.  However, by that time, Plaintiff's

17  psychiatric and emotional issues had become so exacerbated by Met Life's indifference to

18  her problems that any improvements in Plaintiff's physical health were completely

19  overshadowed.

20      5.      The Court finds that Plaintiff has met her burden to demonstrate that Met Life

21  failed to give Plaintiff's interests equal consideration based upon, at a minimum, the

22  following:

23          1) Met Life's unexplained failure to allow Plaintiff or her treating physicians
            to review, comment upon or rebut either of the two opinions reached by Dr.
24          Hopkins before denying the claim;

25          2) Met Life's decision to use as its "consultant" a physician who Met Life
            knew would not be able to see, interview or examine the Plaintiff even
26          though Met Life was aware of numerous qualified physicians in Phoenix able
            to perform this task.  Further, the Court finds that Met Life knew or should
27          have known that a psychiatric illness requires a personal examination by a
            psychiatrist;

28

- 35 -

3)  Although Met Life was not legally required to defer to the opinions of Plaintiff's treating physicians, the Court has considered the nature and strength of Dr. Hopkins's opinions compared to the personal foundation for the opinions offered by Plaintiff's treating physicians.  The Court finds that Met Life did not give "equal consideration" to the evidence supporting Plaintiff's disability that clearly outweighed any conflicting evidence;

4)  The fact that Met Life acknowledged its need to obtain additional medical records concerning Plaintiff's treatment and condition and, at the same time, denied Plaintiff's claim based upon Dr. Hopkins's report clearly demonstrates that Met Life did not give equal consideration to Plaintiff's interests; and

5) Met Life's deliberate and repeated failure to provide its consulting physicians with critical portions of Plaintiff's medical records establishes a failure to give equal consideration to Plaintiff's claim.

6.     Met Life's failure to give Plaintiff's interests equal consideration to the interests of Met Life constitutes bad faith.  <u>Borland v. Safeco Ins. Co. of America</u>, 147 Ariz. 195, 709 P.2d 552 (1985).

7.     The Court finds that Met Life's contention that its denial of the claim was "fairly debatable" is unacceptable because, at a minimum:

1) See subparagraphs (1) through (5), above;

2) The evidence supporting Plaintiff's disability received from her treating physicians was unanimous, consistent, and supported by both subjective and objective findings.  In contrast, the purported opinions offered by Dr. Hopkins, Dr. Lasser and Dr. Givens are, at best, nothing more than that Plaintiff's disability was not "documented."[10]

3) In the face of the significant and unanimous evidence offered by Plaintiff and her treating physicians, and in light of its own nurse consultant's steady opinion that disability had been proven, this Court concludes that Met Life unfairly and erroneously submitted Plaintiff's claim to its "consultants" for review only to obtain some purported factual basis upon which the claim could be denied;

4) Assuming that obtaining the consultant's review was warranted, summarily accepting that consultant's opinion, especially in the areas of psychiatry and fibromyalgia, demonstrates that Met Life's decision to deny the claim was not "fairly made" such that the claim denial could be considered fairly debatable.

[10]     Upon reading this characterization by Met Life of Plaintiff's disability, the Court mused whether Met Life and the Court reviewed and analyzed the same evidence.

- 36 -

1    8.    The Court finds that Met Life unreasonably failed to accept the opinions and

2  diagnoses of Plaintiff's treating physicians without an objective or reasonable good faith

3  belief that those diagnoses and opinions were incorrect.

4    9.    The Court reasonably infers that Met Life intended to ignore or was

5  recklessly indifferent to information and evidence favorable to Plaintiff in order to support

6  a denial of her claim.

7    10.    Met Life's conduct was not the sole cause of Plaintiff's damages, but it

8  significantly contributed to her damages, and absent Met Life's wrongful conduct,

9  Plaintiff's stress, anxiety and emotional suffering would have been markedly less.

10    11.    The Court concludes that Plaintiff's damages caused by Met Life's breach of

11  the duty of good faith and fair dealing supports an award of $20,000.00.

12    Punitive Damages.

13    12.    The Court finds that Met Life's conduct set forth above supports an award of

14  punitive damages.

15    13.    Hawkins v. Allstate Ins. Co., 152 Ariz. 490, 733 P.2d 1073 (1987) specifies

16  three non-exclusive factors that the trier of fact should consider in determining the amount

17  of punitive damages to award:

18    1) the financial position of the defendant;
      2) the nature of the defendant's conduct; and
19    3) the profitability of the defendant's conduct.

20  A plaintiff is not required to present proof of all three factors.  Hawkins, 152 Ariz. at 501.

21    Regarding the first issue, the award must be enough to punish and deter the

22  wrongdoer, but not be so great as to financially devastate the wrongdoer.  Id.  However, it

23  is defendant's burden to present evidence of the amount of punitive damages which would

24  be unreasonably harmful to the defendant.  Asphalt Engineers, Inc. vs. Galusha, 160 Ariz.

25  134, 138, 770 P.2d 1180, 1984 (Ct. App. 1989); Nienstedt v. Wetzel, 133 Ariz. 348, 357,

26  651 P.2d 876, 885 (Ct. App. 1982); Hawkins, 152 Ariz. at 501.    Met Life failed to do so.

27

28

14.     The second issue is the reprehensibility of defendant's conduct. <u>Hawkins</u>, 152 Ariz. at 497. Reprehensibility is heightened if the defendant is aware of the harm or risk that could be, or is suffered by the Plaintiff. <u>Id.</u> Here, Met Life was repeatedly made aware of Plaintiff's ongoing hardships and financial desperation which substantially contributed to her injuries and damages.

15.     The final issue is whether the Defendant profited from its conduct. The reprehensibility of Defendant's conduct is evident if Defendant was motivated by its own financial self-interest or that of its contracting client, here American Express.

16.     The Court finds bad faith by clear and convincing evidence which takes into account Plaintiff's financial and emotional vulnerability of which Met Life was aware. Indeed, Met Life overlooked Plaintiff's hardship in favor of its own self-interests.

17.     The Court finds that Met Life demonstrated a conscious disregard of Plaintiff's interests throughout the claim process with actual knowledge or at least reckless indifference that its behavior caused Plaintiff significant injury, financially, physically and emotionally.

18.     The Court finds no evidence to support a defense of mistake or inadvertence.

19.     Met Life knew or was recklessly indifferent to the fact that Met Life's physicians evaluated Plaintiff's claim without all relevant medical records. Of course, it is no surprise that Plaintiff's treating physicians gave unanimous opinions in Plaintiff's favor. Significantly, however, Met Life's nurse consultant never waivered from the opinion that Plaintiff was disabled. She attempted to persuade others, but in the end she deferred to her supervisor.

20.     Met Life was motivated to deny the short term claim as an adjunct to an eventual denial of the long-term disability claim. Met Life's financial exposure is based on Plaintiff's claim of a mental disability and in particular, Met Life's actions that contributed to Plaintiff's mental disability over the course of a year, which justifies a punitive damage award of $30,000.00.

1    21.    In terms of the "ratio" of punitive damages to the amount of compensatory
2  damages, the Court is cognizant of <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S.
3  408 (2003) and its discussion concerning the relationship between compensatory damages
4  and punitive damages.  Notably, the Supreme Court declined to define the acceptable ratio
5  applicable to any given factual situation and, in fact, made it clear that any limitation to a
6  "single digit ratio" is a mere presumption or guideline.

7    22.    Further, the Supreme Court in <u>Campbell</u> made it clear that in cases where
8  there has been a particularly egregious act committed by a defendant, "ratios [even] greater
9  than those we have previously upheld may comport with due process." <u>Campbell</u>, 538 U.S.
10  at 425.  The Court notes that <u>Campbell</u> did not overrule <u>TXO Production Corp. vs. Alliance</u>
11  <u>Resources Corp.</u>, 509 U.S. 443 (1993), which upheld a punitive damage award in excess of
12  500 times the amount of the compensatory award finding a significant potential for damage
13  caused by the defendant's conduct.  Specifically, the Supreme Court in <u>TXO</u> held it is
14  appropriate for a court to consider the potential harm to others by a defendant if its
15  wrongful conduct is not punished and deterred.  <u>TXO</u>, 509 U.S. at 459.  Although actual
16  numbers were not offered at trial, the Court takes judicial notice that Met Life handles and
17  processes many thousands of income disability claims every year.  As a result, the Court
18  finds a significant basis, as well as a significant need, to impress upon Met Life that the
19  conduct occurring on this claim is not only reprehensible and punishable on its own merit,
20  but also that such conduct cannot be tolerated in the future.  To achieve deterrence an
21  award of punitive damages is necessary.

22    Having fully considered the applicable law concerning punitive damages both in
23  Arizona as well as enunciated by the United States Supreme Court, the Court finds that a
24  punitive damage award of $30,000.00 is both factually and legally appropriate.  It serves
25  the legitimate purpose of both punishment of Met Life as well as deterring other insurance
26  companies from behaving in a similar manner.  The amount of punitive damages is based
27  upon the lengthy amount of time that Met Life had Plaintiff's claim under consideration.  It

28

1  also takes account of Plaintiff's overall improvement over time, which improvement was in

2  no way caused or effected by Met Life.

3       IT IS HEREBY ORDERED that Plaintiff Cynthia Allocco's claim for short term

4  disability is granted in the amount of $9,128.07 on Count I, and that Ralph Allocco is

5  awarded his proportionate share pursuant to the community property laws of Arizona.

6       IT IS FURTHER ORDERED that Plaintiff Cynthia Allocco is awarded the sum of

7  $20,000.00 in damages on Count II.

8       IT IS FURTHER ORDERED that Plaintiff Cynthia Allocco is awarded the sum of

9  $30,000.00 in punitive damages.

10

11  DATED: _12/14/04_____

12

13

14              Roslyn O. Silver

15            United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

- 40 -